F I L E D
**United States Court of Appeals
Tenth Circuit**

**February 14, 2006**

**Elisabeth A. Shumaker
Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAUL "MIKE" PIPPIN,

       Plaintiff - Appellant,

v.

BURLINGTON RESOURCES OIL
AND GAS COMPANY a/k/a
BURLINGTON RESOURCES,
INCORPORATED,

       Defendant - Appellee.

No. 04-2157

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-01-1247 WFD/RLP)**

---

Ray Twohig, Albuquerque, New Mexico, for Plaintiff - Appellant Paul "Mike"
Pippin.

Bradley T. Cave, Holland & Hart, LLP, Cheyenne, Wyoming (Michael L. Carrico
and George McFall, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, New
Mexico, and Elizabeth A. Phelan, Holland & Hart, LLP, Boulder, Colorado, with
him on the briefs) for Defendant - Appellee Burlington Resources Oil and Gas
Company.

---

Before **TACHA**, Chief Circuit Judge, **EBEL**, and **McCONNELL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

Paul "Mike" Pippin ("Pippin") brought this employment discrimination action against his former employer, Burlington Resources Oil and Gas Company ("Burlington"). Pippin alleges that his termination was the product of illegal age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34. Burlington, however, claims to have fired Pippin pursuant to a larger reduction in force ("RIF") and because of Pippin's consistently poor work performance.

Before the district court, Pippin alleged both disparate treatment and disparate impact theories of age discrimination. While this appeal was pending, the Supreme Court decided Smith v. City of Jackson, 544 U.S. 228, 125 S.Ct. 1536 (2005), which holds that disparate impact theories of age discrimination are cognizable under ADEA. This overrules our prior opinion in Ellis v. United Airlines, Inc., 73 F.3d 999 (10th Cir. 1996).

The district court granted summary judgment for Burlington, and Pippin appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## BACKGROUND

Pippin worked for Burlington Resources for ten years in the position of Senior Engineer.[1] In the spring of 2000, Burlington began a corporate

---

[1]In addition, Pippin worked for approximately eight years for Burlington's
(continued...)

restructuring in which it "realigned" its geography-based organization into a function-based one. Burlington's realignment eliminated the high-risk exploration activities in the San Juan Division, and this in turn resulted in a RIF within the division.

To implement this RIF, Mark Ellis, Vice President of the San Juan Division, asked the division's managers to review the organization's future needs and to select the "best performers" to retain. Best performers were selected based on past performance reports and by comparing individuals' skill sets to the organization's future needs. Ultimately, the San Juan Division terminated nineteen employees on or about April 27, 2000, including Pippin, who was fifty-one years old at the time.

## A. Pippin's work performance

Burlington evaluated its engineers and technical staff annually to determine the size of bonus awards. Burlington's evaluation process called for each employee's supervisor to prepare a draft evaluation, and then to meet with other supervisors collectively to discuss and rank each employee compared to all other employees with the same job position.

---

[1](...continued)
predecessors in interest, Meridian Oil and Union Texas Petroleum Company.

Burlington compiled its evaluations on a ranking form that compared employees in three categories: Rank, which ranked employees within a particular employment category; Rating, which gave each employee a letter grade of SE+ or SE [significantly exceeds expectations]; E+ or E [exceeds expectations]; M+ or M [meets expectations]; and Percent Bonus, which showed what percent of eligible bonuses each employee actually earned.

Pippin's annual evaluations indicate he performed well in many technical aspects of his job; however, in the words of the district court, "he lacked certain 'soft skills' and was repeatedly told to improve his relationship with management and fellow co-workers." As the district court summarized, "Burlington Resources viewed the Plaintiff as one of its worst employees for a number of years and ultimately terminated his employment."

Indeed, in 1999, the last ranking year before Pippin's termination,[2] Pippin ranked last out of thirteen senior engineers, and his evaluation form provided:

> This has become a repetitive theme: You need to quit having a strong
> confrontational attitude about Division management. You need to
> become part of the solution, or you are part of the problem. Continue
> to build technical, not experience-based, production engineering
> skills. Quit relying so much on your experience, prove your ideas
> with data.

---

[2]The 1999 rankings were completed in December 1999, four months before the April 2000 RIF. Burlington officials testified that, at the time of this 1999 evaluation process, none of the individuals involved knew there would be a RIF.

In 1998, Pippin was ninth out of eleven senior engineers, and his comments included:

> Mike needs to dramatically improve his versatility to build endorsement from others. He has made some improvements this year in improving his soft skills, and he has looked for opportunities to mentor others and had some success. Mike needs to make an immediate, decisive shift in how he supports our efforts at BR however, for him to progress in his career here. Mike has had several opportunities recently to build endorsement with Division management and staff, and has avoided making that commitment. Consequently, Mike has low endorsement from the management staff and me that he needs to take steps to rebuild.

In the years leading up to 1998, Pippin's rankings consistently placed him in or near the bottom half of his colleagues, and his supervisors' comments uniformly indicated his greatest development needs were in the area of "soft skills," including particularly communication and teamwork.

Although there does seem to be a pattern of Pippin struggling with his "soft skills" at Burlington, and he was ranked last among his Senior Engineer peers in 1999, he did have several positive performance comments in all of the evaluations in the record. For example, Pippin's listed "strengths" in his 1999 evaluation include "[b]road-based experiential production engineering and field skills," being a "self-starter," producing a "[h]igh quantity of sound field engineering work," and "[p]lanning, prioritization, and organizational skills."

**B.     Burlington's application of the RIF**

In 1999, the lowest ranked engineer overall was Craig McCracken, Engineer Advisor, who received 50 percent of his eligible bonus. Five engineers received only 60 percent of their eligible bonuses and thus were tied for the second-to-last ranking among all engineers in 1999. These engineers were Pippin, Senior Engineer; Ralph Nelms, Senior Staff Engineer; Harry Benson, Engineer Advisor; J. A. Michetti, Engineer I; and K. M. Collins, Engineer II.

Of the nineteen employees terminated in the 2000 RIF, three were engineers. Burlington terminated Pippin, Nelms, and Benson; however, McCracken, Michetti, and Collins were retained. According to Burlington, McCracken was kept because he possessed unique "critical" skills.[3] Further, Burlington points out that Michetti was a new hire in June 1999; therefore, his eligible bonus was prorated, and based on his short evaluation period Burlington decided not to include him in the April 2000 RIF. Finally, Collins had a higher rating than either Pippin, Nelms, or Benson in 1998, receiving 90 percent of his eligible bonus while Pippin and Benson both received only 70 percent and Nelms received a prorated 60 percent bonus.

---

[3]According to Burlington's Human Resources Manager, "Mr. McCracken has a specialized skill set in advanced reservoir engineering stimulation, which Mr. Pippin does not possess. Mr. McCracken has specialized expertise and experience in reservoir modeling and other techniques to optimize production through advanced stimulation techniques."

All three of the engineers terminated in the 2000 RIF were over forty.[4] McCracken, who was retained, was also over forty. However, both Michetti and Collins were under forty in 2000. Pippin also notes that the 2000 RIF affected three out of the fourteen over-forty engineers but none of the twenty-two under-forty engineers.

In the fall of 1999, prior to any discussion of the April 2000 RIF, Burlington extended four offers to new engineers coming straight out of college. After the RIF was announced, Burlington "decided to honor those [offers] and hire those people, because we did not want our reputation as a company to be destroyed on those campuses of which those individuals went to school." Burlington also hired Michetti ten months prior to the April 2000 RIF, and eight months after the 2000 RIF, Burlington hired another under-forty engineer.

Finally, Pippin also points out that fourteen of the nineteen employees terminated in the 2000 RIF were over forty; however, Pippin has failed to give us any statistical information about how this compares to the ages of the entire universe of Burlington's San Juan workforce.

C.    History of litigation

---

[4]At the time of the 2000 RIF, Pippin was fifty-one. Both Nelms and Benson were forty-eight. Burlington points out that Nelms, however, was hired in 1998 at the age of forty-seven. In fact, according to Burlington, seven of the nineteen individuals terminated in this RIF had been hired when they were over the age of forty.

Pippin received a right to sue letter from the EEOC on August 3, 2001. Pippin timely filed this case in federal court on November 1, 2001, alleging (1) violation of the Age Discrimination in Employment Act ("ADEA"); (2) violation of a parallel New Mexico Human Rights Act; (3) breach of an implied employment contract; and (4) intentional infliction of emotional distress. Before the district court, Plaintiff conceded Defendant was entitled to summary judgment on the two state common law claims; accordingly, they were dismissed and are not before us on appeal. The district court then granted Burlington summary judgment on Pippin's ADEA and state discrimination claims on July 21, 2003. Pippin filed a motion to reconsider, which the court denied on June 9, 2004. This timely appeal followed on June 29, 2004. Pippin raises only his ADEA claims for our review.

## DISCUSSION

**I.      Jurisdiction and standard of review**

Pippin appeals both the district court's grant of summary judgment in Defendant's favor, and the court's denial of Plaintiff's motion to reconsider under Fed. R. Civ. P. 59(e).  Because Plaintiff's Rule 59 motion was timely, we are permitted on this appeal to consider both the Rule 59 motion and the merits of the underlying judgment.  See Hawkins v. Evans, 64 F.3d 543, 546 (10th Cir. 1995).

The district court had jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331, 1343, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

"We review the . . . grant of summary judgment de novo, applying the same legal standard used by the district court." Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is proper if the evidence, viewed in the light most favorable to the non-moving party, presents no genuine issue of material fact and the court finds the moving party is entitled to judgment as a matter of law. Id.

## II. Adequacy of process leading to summary judgment

Pippin asserts that the district court erred by permitting Burlington to attach several new exhibits to its summary judgment reply brief but did not offer Pippin an additional opportunity to respond to that material.[5] Whether a non-moving party has had an opportunity to respond to a moving party's reply brief at the summary judgment stage is a "supervision of litigation" question that we review for abuse of discretion. Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1164-65 (10th Cir. 1998). Pippin raised this issue in a Rule 59 motion before the district

---

[5]Burlington's reply only responded to Pippin's arguments and did not attempt to raise new any arguments.

The new exhibits Pippin is particularly concerned about include a second affidavit from the San Juan Division's Human Resources Manager, additional excerpts of several depositions, and a copy of Ralph Nelms's 1999 evaluation.

court, the denial of which we also review for abuse of discretion. <u>Adams v. Reliance Standard Life Ins. Co.</u>, 225 F.3d 1179, 1186 n. 5 (10th Cir. 2000).

We find no abuse of discretion in this case. The district court correctly pointed out that approximately a month and a half passed between Burlington filing its reply and the district court's decision. Pippin had plenty of opportunity to seek leave of the court to file a surreply but never attempted to do so.

Our case law requires only that "if the court relies on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials." <u>Beaird</u>, 145 F.3d at 1165; <u>accord</u> <u>Doebele v. Sprint/United Mgmt. Co.</u>, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003). Or, if the district court does preclude a surreply, then the court can avoid error only by not relying on the new materials and arguments in the movant's reply brief. <u>Beaird</u>, 145 F.3d at 1164.

Pippin reads our precedent too broadly to the extent he asserts "<u>Beaird</u> is violated if the trial court considers new matters at all."[6] Here, the district court did not preclude a surreply. Pippin had more than enough time to request time to file a surreply, but did not. Absent such a motion, the district court did not abuse

_____

[6]Before this court, Pippin also argues submitting new affidavits with a reply brief is prohibited under "Rule 56.1." Presumably, he is referring to the local rules for the District of New Mexico. However, we see no express prohibition of the filing of new affidavits in local Rule 56.1. Instead, the Rule says only "[t]he moving party may file a written reply memorandum." D.N.M. R. 56.1(b).

its discretion when it decided this case approximately a month and a half after receiving Burlington's reply.[7]

## III. Disparate treatment theory of age discrimination

The substance of this appeal is devoted to Pippin's claim that he was disparately treated on the basis of his age in violation of ADEA, 29 U.S.C. § 621(a). Because there is no direct evidence of age discrimination, the McDonnell Douglas burden-shifting scheme applies to this disparate treatment claim. Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1216 (10th Cir. 2002). Thus, Plaintiff must first establish a prima facie case of age discrimination in a RIF by showing: (1) Plaintiff was within a protected age group; (2) he was doing satisfactory work; (3) he was discharged despite the adequacy of his work; and (4) there is some evidence the employer intended to discriminate against him in reaching its RIF decision. Beaird, 145 F.3d at 1165; see also Rea v. Martin

---

[7]Although we are convinced the district court committed no error, we note that to the extent any of these additional exhibits actually contained "new" record material, the court's reliance on that "new" information was certainly de minimis. After receiving Pippin's motion for reconsideration, the district court explained:

> [the] Court's reliance upon facts contained in the Reply, if such occurred at all, was de minimis. The Court has reviewed its Order on summary judgment and finds, even excluding the complained-of portions of the decision, ample justification for the Court's conclusion that there are no genuine issues of material fact that entitle Plaintiff to proceed with his case.

As such, any error would have been harmless. See Beaird, 145 F.3d at 1165.

Marietta Corp., 29 F.3d 1450, 1454 (10th Cir. 1994). This fourth element may be established "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the [RIF]." Beaird, 145 F.3d at 1165 (quotation omitted).

If Plaintiff establishes a prima facie case, the burden of production shifts to the Defendant to rebut this presumption of discriminatory intent by asserting a legitimate, nondiscriminatory reason for the employment decision. Id. Once the Defendant meets this burden of production, "the burden shifts back again to the plaintiff to show that the defendant's proffered reasons were a pretext for discrimination." Rea, 29 F.3d at 1455.

In other words, Plaintiff must then resist summary judgment by presenting evidence that the proffered reason was "'unworthy of belief.'" Beaird, 145 F.3d at 1165 (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir.1995)). At this point, the presumption of discrimination established by the prima facie showing simply "drops out of the picture," and the analysis shifts to the plaintiff's ultimate burden of showing that the defendant discriminated on the illegal basis of age. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

There is no dispute that the first two steps of this analysis are satisfied here. Pippin at least met expectations as a Senior Engineer, and he was arguably treated less favorably than younger engineers—including Bobby Goodwin,

thirty-three, who testified he picked up Pippin's paperwork and "made it my own and continued what he did." Defendant's nondiscriminatory reason for terminating Pippin is similarly satisfied as Burlington asserts Pippin was terminated due to the RIF and Pippin's substandard performance. Thus, the only issue before us is "whether Plaintiff has presented specific facts significantly probative to support an inference that Defendant's proffered justifications were a pretext for discrimination." Rea, 29 F.3d at 1455; accord Reeves, 530 U.S. at 147-49.

"In a RIF case, a plaintiff can demonstrate pretext in three principal ways." Beaird, 145 F.3d at 1168. That is, Pippin can present evidence that (1) his own termination does not accord with the RIF criteria, (2) Defendant's RIF criteria were deliberately falsified or manipulated in order to terminate him, or (3) that the RIF generally was pretextual. This third approach is sometimes satisfied by a showing that the defendant actively sought to replace a number of RIF-terminated employees with new hires during the RIF general time frame. Id. In a typical non-RIF context, we have also said a showing of pretext can look to "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." Garrett, 305 F.3d at 1217 (quotation omitted).

Summarizing Pippin's claims on appeal, he asserts (1) the RIF itself was pretextual; (2) Pippin's evaluations, on which the RIF decisions were partly based, were not objective and were manipulated to pervert what was actually a good performance on Pippin's part; and (3) Burlington has a history and pattern or practice of discriminating based on age.

### A.     Pretext in RIF itself

#### 1.     New hires

Pippin says the RIF itself was pretextual because Burlington hired four new college recruits in the summer of 2000, just a few months after the April RIF, and made two other under-forty engineer hires in an eighteen-month period surrounding the RIF.  Pippin says this "eliminates the concept of RIF" and poses a "glaring contradiction" in that, in the face of a RIF, Burlington actually hired new engineers.

Burlington, however, presented evidence that the offers to these "college hires" had been extended in November 1999, before any talk of a RIF was in the wind, and that Burlington "decided to honor those [offers] and hire those people, because we did not want our reputation as a company to be destroyed on those campuses of which those individuals went to school."

As for the two under-forty hires in the eighteen-month period surrounding the April 2000 RIF, Pippin has provided no details about their qualifications or

what job functions they assumed, which makes a comparison to Pippin's abilities and treatment nearly impossible. Moreover, at least for the hiring decision made ten months before the RIF, the record is clear that no one at Burlington's San Juan Division knew to anticipate a RIF at that time. The decision to hire a new engineer eight months after a RIF also fails to account for any non-RIF-related terminations or resignations from within the engineer pool, and that decision is fairly remote from the RIF decision.

Pippin has presented no evidence, other than his own opinions of how a business should be run, to refute these otherwise legitimate considerations. Indeed, our cases have previously held that leaving out new employees from RIF decisions does not establish pretext. See Fallis v. Kerr-McGee Corp., 944 F.2d 743, 745 (10th Cir. 1991).

### 2. "Replacement" by Goodwin

Next, Pippin argues that his "replacement" by Goodwin, a younger engineer, also eliminates the concept of a RIF.

Where an employee is selected for RIF termination "solely on the basis of position elimination," qualifications become irrelevant and one way that employee can show pretext is to present evidence that his job was not in fact eliminated but instead remained "a single, distinct position." Furr v. Seagate Tech., Inc., 82

F.3d 980, 988 (10th Cir. 1996); see also Abuan v. Level3 Commc'ns, Inc., 353 F.3d 1158, 1169 (10th Cir. 2003).

Here, however, Burlington reduced its overall complement of petroleum engineers based on a combination of past performance and skill set matches.[8] The fact that Pippin's employment duties were assumed by another employee does not establish pretext. Moreover, Burlington established that Goodwin was an exceptional performer, receiving the highest possible rating in both 1999 and 1998. Indeed, Goodwin earned 100 percent of his eligible bonus in 1999 and 120 percent of it in 1998.

### 3.    Impact of RIF on Pippin's responsibilities

Finally, Pippin argues that, because Burlington's larger restructuring resulted in the elimination of the high-risk exploration projects in the San Juan Basin, and Pippin was not involved in these high-risk projects, any RIF that subsequently included him was pretextual.

Burlington responds that "it would show poor business judgment to terminate the higher performers just because they were working on a high risk project at the time, where such higher performers could readily shift into remaining job functions." This conforms with the testimony that RIF-terminated

---

[8]Indeed, Burlington officials testified that "there was no pre-determined specified percentage of positions to be eliminated across the company and that reduction in staff would be made by the local site management."

employees were selected after reviewing what the organizational needs were and then determining who the "best performers" were to meet those needs into the future. We see no reason to second-guess these business judgments or to infer that Burlington's RIF itself was pretextual.

**B.     Pretext in Pippin's prior work performance evaluations**

**1.     Objectivity of evaluations**

Pippin also argues he has presented evidence of pretext because his evaluations were too subjective. He complains, in particular, that the process included input from other supervisors and the possibility of changes being imposed by higher-level managers.

Our cases have regularly affirmed grants of summary judgment for employers who based RIF terminations on employee rankings. E.g., Rea, 29 F.3d at 1456; Fallis, 944 F.2d at 744. The subjective nature of the evaluations may be a factor to consider in pretext but it ordinarily is not by itself sufficient to establish pretext. Furr, 82 F.3d at 987 ("the use of subjective criteria does not suffice to prove intentional age discrimination."); see also Simms, 165 F.3d at 1328 ("Evidence of pretext may include . . . the use of subjective criteria."); Bauer v. Bailar, 647 F.2d 1037, 1046 (10th Cir.1981) (noting that although subjective criteria are not wrongful per se, it does "provide[] an opportunity for unlawful discrimination").

Nonetheless, Pippin cites language from one of our subsequent non-RIF ADEA cases where we said "[a]bsent evidence that [the employer's] system of ranking and evaluation relies on objective criteria, we hold that [the employee] has satisfied his burden to demonstrate pretext . . . for the purposes of avoiding summary judgment." Garrett, 305 F.3d at 1218. Although this language is indeed broad, our holding in Garrett was much more narrow. There, the plaintiff's rankings had taken an abrupt turn for the worse almost immediately after that plaintiff began organizing a pro-diversity committee at the work place. Moreover, the defendant did not contest, consistent with expert testimony on the subject, that the rankings were "wholly subjective." Id. at 1214, 1218. Indeed, elsewhere in Garrett we clarified that "[w]hen viewed in the aggregate, his proffered evidence is sufficient to raise a genuine doubt about Defendant's motivation." Id. at 1220 (emphasis added, quotation omitted).

Unlike in Garrett, here we do not consider Burlington's evaluation process "wholly subjective." The evaluations, while covering such subjective considerations as team building, personal leadership, and personal accountability, also required the employee's immediate supervisor to enumerate specific results achieved with supporting examples. Burlington also used a particular evaluation form that included multiple mandatory areas for evaluation, and Pippin's evaluations showed a consistent pattern of "soft skill" issues over more than ten

- 19 -

years. Thus, neither the contents of, nor Burlington's reliance on, these evaluations support an inference that Burlington's proffered reasons for terminating Pippin were pretextual.

## 2. Manipulation of Pippin's evaluations

Pippin also asserts pretext by asserting that the evaluations and rankings "used by management for the announced purpose of determining bonus levels is known and understood by management to be the likely basis for layoffs or reductions in force." He claims that the "RIF must have been in the wind at the time of the 1999 ranking process" and that his 1999 evaluations were "manipulated in order to place him last because there was personal animosity between himself and one of the team supervisors." Finally, Pippin argues that the criticisms in his evaluations were "false, vague, and . . . put in the evaluation so they could fire Pippin because of his age" and that instead he had "very substantial success" at Burlington.

However, we see no permissible inference of pretext from any of these self-serving claims. For example, Pippin complains that one of the upper-level managers had previously suggested that Pippin should be "managed out of the company."[9] He asserts that this establishes "an ulterior motive other than the

---

[9]The evidence on which Pippin relies for proof of this statement is from the testimony of a non-engineering supervisor at Burlington:

(continued...)

supposedly objective criteria which Defendant claimed to use" which Pippin

asserts evidences "manufactured reasons for termination." To the contrary, this

statement simply supports Burlington's assertion that Pippin had a longstanding

performance problem prior to the 2000 RIF.

Similarly, Pippin's complaint that his 1999 evaluation was "manipulated" is

without merit. He cites two versions of this evaluation in the record—the first is

unsigned and the second is signed by Pippin, Pippin's immediate supervisor, and

his supervisor's manager, and dated January 2000, well before the April 2000

RIF. Pippin notes that the second copy includes additional negative comments

---

[9](...continued)

Q.    Do you remember any comment anyone made about what
      should happen with Mr. Pippin?
A.    I can remember—and here again, I don't know what time cycle
      this was. I can remember the comment being made, should he
      be managed out of the organization.
Q.    Do you remember who made that comment?
A.    Danny Hill.
Q.    Was it a question he was asking or a recommendation he was
      making?
A.    I think it was a question. I don't remember how or if it were
      answered, but I believe it was a question . . . .
A.    I really didn't know what—I had never heard it before, or I'm
      not sure what it meant, or no, sir.
Q.    Was there a follow-up discussion about it?
A.    Not that I was in attendance.

This provides very thin support for Pippin's claim.

that do not appear on the first, unsigned version.[10]  Although this language may well have been added, Pippin's final scores in the 360 degree feedback portion of the evaluation are the same on both versions and, on both, Pippin received an overall rating of "Met Expectations +".  Furthermore, similar, albeit more generic comments, are on both versions under Pippin's "Development Needs."  Finally, multiple supervisors' opinions are imbedded in the ranking process itself and, as this evaluation is in substance consistent with Pippin's earlier evaluations, we see no reason to suspect pretextual manipulation of the evaluations.

Finally, although Pippin certainly thinks he was well qualified and a good performer, "[i]t is the perception of the decision maker which is relevant, not plaintiff's perception of [him]self."  Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).  Indeed, an employer "may chose to conduct its RIF according to its preferred criteria of performance . . . and we will not disturb that exercise of defendant's business judgment."  Beaird, 145 F.3d at 1169; see also

_____

[10]These additional comments are:

Resisted supporting MV Best Practices study with PUD team and Drilling.  Consistently showed lack of support for team effort and results.
Consistently fails to understand the damage done to integrity of Division leadership by constantly telling less experienced junior staff of 'We vs. Us' situations.  Mike's regular negative comments about direction of the management staff and activities of the Drilling group severely damage his credibility with Division leadership.

Lucas v. Dover Corp., Norris Div., 857 F.2d 1397, 1403-04 (10th Cir. 1988) ("This court will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives."); Simms, 165 F.3d at 1330 (noting it is not court's role to establish defendant's hiring criteria or act as super personnel department).[11] Pippin may have produced technical results, but Burlington's decision to terminate Pippin due to his poor soft skills does not warrant an inference of pretext.

### C. Burlington history and pattern of age discrimination

Finally, Pippin argues a jury could infer pretext because Burlington has a "long history" of preventing Senior Engineers from retiring, and statistical evidence reveals a pattern of age discrimination.

However, Pippin has presented no reliable evidence on these points. First, as for the history of preventing retirements, Pippin relies on his own deposition testimony and the testimony of Kenneth Raybon. Raybon, who is not an engineer, was a "production superintendent" with Burlington but was demoted to "senior supervisor" in May 2000. The testimony Pippin relies on from Raybon is as follows:

---

[11]Pippin also complains that he had no opportunity to appeal the criticisms within Burlington; however, Pippin cites no authority for the proposition that an employer must provide an employee with this type of appeal procedure, and we know of none.

- 23 -

Q. Have you ever seen a senior engineer retire at Burlington?

A. A senior engineer retire?

Q. Yes.

A. I can only remember, I guess, going back to ancient history maybe early '90s. I can only remember one engineer retiring, and I'm not even sure what his classification was. . . .

Q. What happens to all these engineers? It seems like the place is filled with them, and none of them retire. Why is that?

A. I think for the most part, they're probably not of retirement age.

Q. At least, not the ones that continue to be employed here, right?

A. I can't think of one who is 55 years or older, as we speak.

Q. Can you think of any who have gotten terminated besides Mr. Pippin who are approaching that age?

A. No, sir.

However, absent information about what happened to the other senior engineers—whether they were promoted to other positions or terminated to avoid retirement—this weak evidence does not support an inference that Defendant's stated reasons for termination were pretextual.

Similarly, Pippin's allegation of a statistical pattern of age discrimination—apparently inferred from the fact that fourteen of the nineteen employees terminated in the 2000 RIF were over forty—is not supported by the record.[12] "Statistical evidence which fails to properly take into account

---

[12]Before this court, Pippin adds that Burlington "chose to terminate from the Senior staff list rather than all engineers in the San Juan division" and this resulted in the termination of a "disproportionate number of those over 40," who were then "replaced" by younger engineers. We assume Pippin is referring to the fact that, of the three engineers terminated, their positions were Senior Engineer, Senior Staff Engineer, and Engineer Advisor, while Michetti and Collins, who

(continued...)

nondiscriminatory explanations does not permit an inference of pretext." Furr, 82

F.3d at 987. A "plaintiff's statistical evidence must focus on eliminating

nondiscriminatory explanations for the disparate treatment by showing disparate

treatment between comparable individuals." Rea, 29 F.3d at 1456 (quotation

omitted). Statistical evidence that does not adjust "for the various performance

evaluations and departmental rankings of the employees included in the statistical

pool" does not compare "similarly situated" employees and therefore "fails to

eliminate nondiscriminatory explanations for disparate treatment." Id.

In this case, Pippin's statistical evidence that fourteen out of nineteen

RIF-terminated employees were over forty does not account for any of these

different individuals' circumstances, skills, or prior performances. It represents

only a very small sample size, cf. Mayor of Philadelphia v. Educational Equality

League, 415 U.S. 605, 621 (1974) (noting concern with sample size of thirteen),

and it fails to tell us what portion of the overall Burlington workforce was over

forty in order to compare whether 14/19 is an excessive percentage of over-forty

---

[12](...continued)
also ranked low in 1999, held positions of Engineer I and Engineer II.

Also, Burlington has presented evidence that these other engineers were not similarly situated because they either had unique skills Pippin did not possess or they had better performance histories than Pippin. Further, given there are legitimate reasons for this different treatment of individuals, Pippin has not shown that Burlington actually considered whether a poor-performing engineer was junior or senior in making its RIF elimination decisions.

terminations. See Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1139 (10th Cir. 2000) ("[S]tatistics concerning employees terminated in a RIF are probative to the extent they suggest that [protected classes of employees] were not treated less favorably than [the privileged classes].").

### 4. Conclusion

Taking all of this together, we agree with the district court that Pippin has not presented sufficient evidence to support an inference of pretext. The RIF was implemented consistently, and Pippin has presented no evidence of a history of discrimination or a discriminatory intent in terminating Pipping. Accordingly, we affirm the district court.

## IV. Disparate impact theory of age discrimination

After briefing in this appeal, the Supreme Court decided Smith v. City of Jackson , 544 U.S. 228, 125 S.Ct. 1536 (2005), which overrules our prior opinion in Ellis v. United Airlines, Inc., 73 F.3d 999, 1007 (10th Cir. 1996). Smith definitively holds that disparate impact theories of age discrimination are cognizable under ADEA. 544 U.S. at —, 125 S.Ct. at 1540.[13]

---

[13]This controlling interpretation of federal law applies to Pippin's still-open appeal . See DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377, 1388 (10th Cir. 1990) ("Once the Supreme Court has interpreted a statute, that construction becomes a part of the statute, and the Court's interpretation applies retroactively to pending cases."); see also id. at 1391 n.11 ("Judicial decisions operate retroactively because we generally regard them as an expression of

(continued...)

## A.    Preservation of issue

Pippin's complaint did not originally assert a federal disparate impact theory.  Nonetheless, Pippin did assert a federal disparate impact claim in a footnote to his summary judgment response brief.  This footnote arose in the context of Pippin's assertion that the pattern of terminations of over-forty engineers combined with Burlington's decision to hire a group of new engineers under the age of forty showed that the RIF was pretextual.  That footnote reads in its entirety:

> Not only is the explanation given contrary to reason, and thus probative of disparate treatment, this RIF had a disparate impact on those over 40.  Plaintiff recognizes that the disparate impact argument has been rejected in the Tenth Circuit,      Ellis v. United Airlines, Inc. , 73 F.3d 999, 1006 (10th Cir. 1996), but points to the argument and authorities cited in the brief of Petitioner in      Adams v. Florida Power Corporation    at 2002 WL 169282 which justify presentation of this issue in this case.  Though certiorari was granted in that case, it was fully briefed, and oral argument was held, 122 S.Ct. 643, certiorari was dismissed as improvidently granted, 122 S.Ct. 1290 (April 1, 2002).  Plaintiff here asserts that disparate impact claims are viable under [ADEA], and that he has presented evidence which establishes the viability of his claim under that theory.

Burlington never objected to the assertion of this new claim below, and on appeal Burlington acknowledges that we may consider the disparate impact theory because " Smith changed the law in this Circuit while the appeal was pending."

---

[13](...continued)
pre-existing law.")

Gray v. Phillips Petroleum Co._, 971 F.2d 591, 592 n.3 (10th Cir. 1992); Anixter v. Home-Stake Prod. Co._, 77 F.3d 1215, 1222, 1231-32 (10th Cir. 1996). We agree, and will consider the claim.

Pippin asks that we "reverse and remand for consideration of the applicability of that claim in this case." However, it is not our usual practice to give litigants the proverbial second bite at the apple. Pippin claims here that he "asserted" the claim below, and he stated before the district court that he "presented evidence which establishes the viability of his claim under that theory." Even on appeal Pippin concedes that "the factual predicate was laid" for his disparate impact claim and he asserts no specific additional facts or evidence that he could submit on the RFOA defense that is not already in the record before us. Pippin's request for remand was not to present more evidence but merely to allow the district court to consider the applicability of the claim. However, as a matter of law, our review of the district court's grant of summary judgment is de novo and, just as the Supreme Court did for the litigants in Smith, we are fully capable of reviewing the substance of Pippin's assertions as they now stand.

**B.    Disparate impact claims under ADEA**

"A claim of disparate impact, unlike a claim of disparate treatment, does not require a finding of intentional discrimination." Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1242 (10th Cir. 1991). To the contrary, the entire "necessary

premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." Id. (internal quotations and citations omitted); accord Faulkner v. Super Valu Stores, Inc. , 3 F.3d 1419, 1428 (10th Cir. 1993).

Although the Supreme Court in Smith recognized that "the ADEA does authorize recovery in 'disparate-impact' cases," the Court clarified that the "scope of disparate-impact liability under ADEA is narrower than under Title VII." 125 S.Ct. at 1540, 1544. Indeed, the Court held that while the Civil Rights Act of 1991 expanded an employer's exposure to liability on a disparate impact theory in Title VII, these 1991 amendments did not affect ADEA or "speak to the subject of age discrimination." Id. at 1545. Therefore, the Court's narrower pre-1991 interpretation of disparate impact liability, as articulated in Wards Cove Packing Co. v. Atonio , 490 U.S. 642 (1989), "remains applicable to the ADEA." Smith , 125 S. Ct. at 1545.

This Wards Cove framework requires that "[t]o establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group." Ortega , 943 F.2d at 1242; see also Wards Cove , 490 U.S.

at 655-56. Thus, an employee must point to both a significant disparate impact and to a particular policy or practice that caused the disparity.

Moreover, "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'" Smith, 125 S.Ct. at 1545 (quoting Wards Cove, 490 U.S. at 656) (emphasis original).

In the pre-1991 disparate impact claims under Title VII, once a plaintiff successfully asserted a prima facie case of disparate impact discrimination, the burden of production shifted to the employer to produce evidence of "business necessity" for the challenged practice. Ortega, 943 F.3d at 1243 (quotation omitted). Once such evidence was produced, the plaintiff had the ultimate burden of persuading the factfinder that "other tests or selection devices, without a similarly undesirable discriminatory effect, would also serve the employer's legitimate [business] interests" and be "equally effective" in achieving those goals. Id. at 1244 (quotations omitted).

However, the ADEA test for disparate impact departs from the Wards Cove analysis in this regard. As the Smith Court explained, ADEA is also unique from Title VII in that ADEA "contains language that significantly narrows its coverage

- 30 -

by permitting any 'otherwise prohibited' action 'where the differentiation is based on reasonable factors other than age.'" Smith, 125 S. Ct. at 1540-41 (quoting 81 Stat. 603, see 29 U.S.C. § 623(f)(1)). This exception from otherwise prohibited actions is satisfied by "reasonable factors other than age" rather than requiring a "business necessity," and that significantly limits an employer's potential liability for disparate impact under ADEA. This exception, known as the RFOA exception, reads as follows:

> "It shall not be unlawful for an employer, employment agency, or labor organization to take any action otherwise prohibited . . . where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age."

29 U.S.C. § 623(f)(1) (emphasis added).

Thus, after an employee establishes a prima facie case of disparate impact age discrimination under the ADEA, the burden of production shifts to the employer to assert that its neutral policy is based on a reasonable factor other than age. Indeed, "[u]nlike the business necessity test [under Title VII], which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement." Smith, 125 S. Ct. at 1546. Instead, to prevail on an ADEA disparate impact claim, an employee must ultimately persuade the factfinder that the employer's asserted basis for the neutral policy is

unreasonable . See id. The test is not whether there were other more narrowly tailored ways for the employer to achieve its legitimate business goals. See Embrico v. U.S. Steel Corp. , 404 F. Supp. 2d 802, 830 (E.D. Pa. 2005) (in dicta; applying Smith ). Instead, the employee must show that the method selected was unreasonable.

Turning again to the Smith case as illustration, the Court there explained that even if the officers had established a prima facie case, they could not have prevailed because "it is also clear from the record that the City's plan was based on reasonable factors other than age." Smith , 125 S. Ct. at 1545. The disparate impact attributable to the City's pay plan was a result of:

> [T]he City's decision to give raises based on seniority and position. Reliance on seniority and rank is unquestionably reasonable given the City's goal of raising employees' salaries to match those in surrounding communities. In sum, we hold that the City's decision to grant a larger raise to lower echelon employees for the purpose of bringing salaries in line with that of surrounding police forces was a decision based on a 'reasonable factor other than age' that responded to the City's legitimate goal of retaining police officers.

Id. at 1546.

### C. Application to Pippin's claims

In this case, Pippin has failed to establish evidence supporting a prima facie case of disparate impact. Pippin notes that the RIF itself, or how the RIF was applied, resulted in the termination of more over-forty workers than

under-forty employees. However, absent any evidence of the "comparables"—i.e., the age of Burlington's other employees or even the age of the other employees in the San Juan Division—this statistic has little significance. See Sloat v. Rapid City Area Sch. Dist. No. 51-4, 393 F. Supp. 2d 922, 935 (D.S.D. 2005) (granting employer summary judgment where employee had failed to allege prima facie claim of disparate treatment under the ADEA because he failed to allege any statistics showing a disparate impact).

But, even if Pippin established a prima facie case, Burlington was entitled to summary judgment pursuant to the RFOA defense. Pippin claims the specific policy that led to a disparate impact on those employees over the age of forty was a policy of determining which employees to let go during the RIF based on prior job performance and skill set. Pippin couples that policy with Burlington's policy of honoring its prior commitment to hire several new employees fresh out of school to assert that Burlington's policies were not reasonable.

However, as a matter of law, these were not unreasonable policies. Certainly, relying on prior performance ratings and the determination of which employees have the skills most useful to the company going forward are reasonable criteria for any company to use in deciding which employees to keep and which to let go in a RIF. See Embrico, 404 F. Supp. 2d at 829 (in dicta,

noting that employer's reliance on employee's technical background to select employees for retention was reasonable).

Further, a decision by Burlington to honor its prior commitment to new hires in order to protect its hiring reputation at the schools involved is reasonable, as is the decision to keep new hires who have not yet been evaluated.

All of these decisions were based on reasonable factors other than age. Corporate restructuring, performance-based evaluations, retention decisions based on needed skills, and recruiting concerns are all reasonable business considerations. Pippin has not presented any evidence sufficient to withstand summary judgment to the contrary. Indeed, Pippin has cast no doubt on the reasonableness of these concerns at all. See Embrico, 404 F. Supp. 2d at 830 (noting, in dicta, that employer would be entitled to summary judgment because employee was unable to contradict employer's evidence that its policy of relying on employees' technical background to determine which employees to retain was reasonable). Accordingly, we affirm the district court. Pippin has not set forth a valid disparate impact claim.

## CONCLUSION

We AFFIRM the district court's grant of summary judgment in Burlington's favor.