**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 23, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

RICHARD C. ENDERWOOD,

Plaintiff-Appellant,

v.

SINCLAIR BROADCAST GROUP,
INC.; M. WILLIAM BUTLER;
DONALD H. THOMPSON; KOKH,
LLC,

Defendants-Appellees.

No. 06-6232
(D.C. No. CIV-03-1729-T)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **BALDOCK**, and **MURPHY**, Circuit Judges.

In this employment-discrimination case, Richard C. Enderwood appeals

from district court orders that (1) granted the defendants' summary judgment

motion on his federal age-discrimination and state wage claims; and (2) dismissed

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

his state age-discrimination and interference-with-contract claims. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

Sinclair Broadcast Group, Inc., owns numerous television stations, including station KOKH in Oklahoma City. KOKH is affiliated with the Fox television network. Bill Butler is Sinclair's vice-president of group programming and promotions. He sets promotion policy and strategy and is in charge of the operating, promoting, and advertising budgets.

Fox provides its affiliates with "guidelines," which "vary for each Sweeps Rating Period." Aplt. App., Vol. 3 at 804. The "ratings" relate to the percentage of households viewing a particular program, and the "sweeps periods" serve as measures of advertising sales. Sinclair and its stations occasionally depart from Fox's guidelines to further their own interests; Sinclair evidently believes that this is not inconsistent with the Fox guidelines.

In December 2000, Sinclair hired Enderwood, who was fifty-three years old, to work as the KOKH promotion manager. Butler approved a salary for Enderwood that was $23,500 more than the former promotion manager's salary. Enderwood was responsible for all facets of station promotion, with the goal of maintaining ratings and a positive station image. In January 2003, Enderwood was given a $2,500 raise.

Butler had monthly conference calls with promotion managers, including Enderwood. During one such call, Butler complained of "a mole who was passing information on to the networks," *id.* at 805, and he threatened to fire that person when he discovered who it was, *id.* at 728. Butler's threat was consistent with Sinclair's written employment policy, which states that "[a]n employee's disclosure of confidential information is prohibited and will not be tolerated." *Id.* at 834. "Confidential information" is defined in the policy as "price lists, compensation, personnel data, advertising, marketing and promotional ideas and strategies, contest information, customer lists, financial or securities information, program schedules, pending projects or proposals, rate cards, technological data, contracts, and research and development strategies." *Id.* at 834. When Enderwood was hired, he acknowledged in writing his receipt of Sinclairs' employment-policy manual, and he agreed to abide by its "policies, rules, and procedures." Aplee. Supp. App. at 47.

Sometime around March 2003, Fox requested that its affiliates purchase two "100 point schedules to promote Tuesdays in the May Sweeps Period." Aplt. App., Vol. 3 at 800. According to Enderwood, this would present "an extraordinary concentration of rating[s]." *Id.* at 732.

On March 5, Butler instructed Sinclair's Regional Promotions Manager, Mike Hansen, that Sinclair's stations should only purchase one "100 point schedule for promoting Tuesdays." *Id.* Hansen sent Butler's instruction via email

to Enderwood and other promotion managers. "[B]ecause [he] was very confused" by the email, *id.* at 734, Enderwood forwarded it to Fox representative Todd Lacey, asking: "Confidentially, what is [Butler] talking about? I thought you wanted one days worth on Tuesday and then we pick which spot to run on which station based upon demographic characteristics of each station?" *id.* at 802; *see also id.* at 734, 738. Lacey responded: "[H]e's misinformed. [Y]ou can't pick one or the other. [Y]ou'll have to purchase all of Tuesday . . . a different buy for each show . . . it's pretty well spelled out in the guidelines we sent." *Id.* at 810 (ellipses in original). According to Lacey, Butler's instructions did not comply with Fox guidelines.

According to Hansen, Lacey soon called to discuss the email's contents with him. Afterward, Hansen notified Butler that someone had forwarded the email to Lacey. Butler then engaged Sinclair's vice-president of human resources, Donald Thompson, to find out who had forwarded the email to Lacey. A search of Sinclair's email-server logs revealed Enderwood as the source.

On March 6, Butler told Thompson and KOKH General Manager Randy Pratt that Enderwood should be terminated for disclosing internal information to Fox. Additionally, either Butler or Thompson identified Enderwood as the "mole within the organization . . . [who] had been leaking company information to outside sources." *Id.* at 752-53. Pratt terminated Enderwood on March 7 and

later hired a thirty-two-year-old replacement. Enderwood claims that at the time of his termination he had accrued unused vacation time worth $2,910.

After exhausting administrative remedies, Enderwood sued Sinclair, KOKH, Butler, and Thompson in federal court on December 19, 2003. He asserted five claims: (1) violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634; (2) violation of Oklahoma's Anti-Discrimination Act (OADA), Okla. Stat. tit. 25, §§ 1301-11; (3) failure to pay for accrued and unused vacation under Okla. Stat. Ann. tit 40 § 165.9; (4) interference with his employment agreement with KOKH; and (5) violation of the Oklahoma common-law public-policy tort prohibiting employment discrimination identified in *Burk v. K-Mart Corp.*, 770 P.2d 24, 29 (Okla. 1989). The defendants moved to dismiss the complaint in its entirety, arguing, among other things, that Enderwood's *Burk* claim failed because the ADEA provided an adequate statutory remedy. In Enderwood's response to the motion, he opposed dismissal of his other claims but conceded that his *Burk* claim was without merit. Aplt. App., Vol. 1 at 66 (citing *List v. Anchor Paint Mfg. Co.*, 910 P.2d 1011 (Okla. 1996) (declining to extend *Burk* to age-discrimination claims), *abrogated by Saint v. Data Exch., Inc.*, 145 P.3d 1037, 1038-39 (Okla. 2006)). Enderwood also obtained leave to file an amended complaint. After Enderwood filed the amended complaint, which omitted the *Burk* claim but retained the other four original claims, the district

court denied the defendants' motion to dismiss as moot, without prejudice to refiling.

The defendants next moved to dismiss the amended complaint. In May 2004, the district court granted the motion in part, ruling that (1) Enderwood's OADA claim failed because the OADA offers only an administrative remedy from the Oklahoma Human Rights Commission, which can issue cease-and-desist orders; and (2) the interference-with-contract claim failed because "Butler and Thompson were acting on behalf of [Sinclair], who [Enderwood] alleges is essentially the same entity as [KOKH]." *Id.* at 266.

After conducting discovery, the defendants moved for summary judgment on Enderwood's remaining two claims. In June 2006, the district court granted the motion, ruling that (1) Enderwood's ADEA claim failed because the defendants' stated reason for firing Enderwood—disclosing Sinclair's intent to not comply with Fox's guidelines—was not a pretext for age discrimination, and there was no pattern or practice of age discrimination at Sinclair or KOKH; and (2) Enderwood's claim regarding vacation pay failed because Sinclair's employee handbook precluded payment for accrued but unused leave if the employee was terminated for cause.

Enderwood now appeals the four district court determinations. He also seeks to certify the vacation-pay claim to the Oklahoma Supreme Court. We

affirm the dismissal of Enderwood's claims for substantially the same reasons as the district court, and we deny his motion to certify.

**DISCUSSION**

### I. Standards of Review

We review a district court's decision to grant summary judgment de novo, using the same legal standard applicable in the district court. *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). While "[w]e resolve all factual disputes and draw all reasonable inferences in favor of the non-moving party," *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006), "[m]ere allegations unsupported by further evidence" will not prevent summary judgment, *Baca*, 398 F.3d at 1216.

Additionally, we "review[ ] a district court's order granting a motion to dismiss for failure to state a claim de novo." *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 898 (10th Cir. 2006). In doing so, "[w]e accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the nonmoving party," affirming "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." *Id.* at 898-99 (quotation and citation omitted).

-7-

## II. The ADEA Claim

The three-stage framework crafted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies to ADEA discriminatory-discharge claims that are premised on indirect evidence of discrimination. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). Under that framework, the plaintiff must initially prove a "prima facie case by establishing that he was: (1) within the age group protected by the ADEA when he was terminated, (2) performing his job satisfactorily, (3) discharged, and (4) replaced by a younger person." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). If a prima facie case is established, a presumption of discrimination arises, requiring the employer to produce a legitimate, nondiscriminatory reason for the discharge. *Id.* Finally, "[i]f the employer proffers a legitimate reason, the employee then must prove, by a preponderance of the evidence, that the employer's explanation is merely a pretext for unlawful discrimination." *Id.*

Enderwood proceeds directly to the final stage of *McDonnell Douglas*, arguing that there are "many contradictions demonstrating pretext." Aplt. Br. at 9. Pretext "can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted

non-discriminatory reasons." *Rivera v. City & County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (quotation omitted). While reviewing for pretext, we do not "act as a super personnel department that second guesses employers' business judgments." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (quotation omitted). Moreover, "mere conjecture that the[ ] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Palochko v. Manville Corp.*, 21 F.3d 981, 982 (10th Cir. 1994) (quotation omitted).

Enderwood suggests he has demonstrated pretext, setting out a confusing and conflicting litany of claims, including: the Fox representative's recollection of the call to Hansen; the discrepancy as to who made the termination decision; Sinclair's failure to complain about the email; the alteration of the email; and, finally, that the company's policy reveals a pattern of age discrimination.

Enderwood first cites Fox representative Lacey's inability when deposed to recall telephoning Hansen about the subject email. But Lacey also testified to "business related" telephone conversations with Hansen, Aplt. App., Vol. 5 at 1118, and that he would not doubt Hansen's recollection of the call, *id.* at 1109. As we noted above, Hansen testified that shortly after he sent the email to Enderwood, Lacey called to discuss it. In any event, the relevance of Lacey's memory lapse is suspect. Even if Lacey did not call Hansen, the fact remains that

Enderwood forwarded the email to Lacey. The manner by which Hansen actually learned of the forwarding says little about whether Enderwood was fired because of his age.

Enderwood also references Lacey's belief that nothing in the email revealed a "promotion strategy." *Id.* at 1122. But Lacey's beliefs are, as the district court noted, mostly irrelevant. In a discriminatory termination case, it is the employer's beliefs that count. *See Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1178 (10th Cir. 2005) (stating that the relevant inquiry "concerns the belief of the employer that the employee engaged in misconduct, not whether the actual facts, as shown by evidence extrinsic to the employer's assessment, may have been otherwise"); *Rivera*, 365 F.3d at 925 ("In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision." (quotation omitted)).

Enderwood next attempts to identify a discrepancy as to who made the ultimate termination decision. Human resources vice-president Thompson testified that "Pratt [the KOKH General Manager] ultimately made the final decision," but he immediately clarified, "Well, it was a collaborative discussion." Aplt. App., Vol. 5 at 1153. And Pratt testified that programming-and-promotions vice-president Butler's directive to fire Enderwood occurred while he (Pratt), Thompson, and Butler were discussing what to do about Enderwood's disclosure to Lacey. *Id.* at 1146-47. We do not see a conflict between Pratt and

Thompson's testimony. And even if we assume that Pratt and Thompson offered differing testimony regarding "who had had the final say so in terminating Richard Enderwood," *id.* at 1153, that does not suggest any sort of age-related animus.

Enderwood further claims pretext in Sinclair's failure to complain that he also forwarded the subject email to a KOKH advertising agent. Enderwood contends that this proves he did not violate company policy. Again we see no relevant connection to pretext. A disclosure to a KOKH advertising agent that Butler intended to deviate from Fox's guidelines is not the same thing as a disclosure of that intention to the very entity interested in enforcing those guidelines. Moreover, Pratt and Butler testified that Enderwood's disclosure to Fox violated company policy. *See id.*, Vol. 3 at 763 (Pratt deposition); *id.* at 806 (Butler affidavit).

Enderwood also cites (1) his deposition testimony that Pratt seemed reluctant to fire him; and (2) the deposition testimony of a KOKH news director, who told Enderwood that his termination was unjustified. This evidence says nothing of pretext when viewed in context. First, Pratt testified that he "agonized" about firing Enderwood and that "it was not a happy day for [him]" because he and Enderwood were friends and had known each other for twenty years. *Id.* at 756. Second, the news director testified that he told Enderwood that

the termination was unjustified because "he felt sorry for [Enderwood]." *Id.*, Vol. 5 at 1170.

Next, Enderwood asserts that the "email was altered." Aplt. Br. at 11. But he does not identify the purported alteration. And during his deposition, he extensively discussed the email, never mentioning any alteration to its content. Aplt. App., Vol. 3 at 733-35, 738-39. Moreover, he admits forwarding the email to Lacey. *Id.* at 738.

Enderwood further contends that he has adduced a pattern of age discrimination. Evidence of pretext may include the employer's policy and practice regarding its employment of persons in the protected age group. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002). But because "pattern and practice evidence standing alone will rarely suffice to show pretext," *Ortiz v. Norton*, 254 F.3d 889, 897 (10th Cir. 2001) (quotation omitted), we have cautioned employees to produce "reliable evidence on these points," *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1197 (10th Cir. 2006).

As evidence of a discriminatory pattern, Enderwood cites his affidavit testimony that he became concerned in late 2002 "that there was a 'hit list'" against older employees, including himself. Aplt. App., Vol. 5 at 1074. But he has "never seen the list," *id.*, Vol. 7 at 1541, and he does not address how being on such a list squares with the facts that he was hired when he was fifty-three, he was paid a salary substantially more than his predecessor, and he was given a

-12-

raise in January 2003. He also directs our attention to the affidavits of two former "[m]aster [c]ontrols [o]perator[s]" at KOKH who offered their beliefs that older employees "were being singled out and treated unfair[ly]" so they would quit. *Id.*, Vol. 5 at 1077; *id.* at 1081. Neither operator offered any foundational support for his belief, however, other than his own resignation, and only one of the operators was in the protected age group when he resigned, *see* 29 U.S.C. § 631(a) (applying the protections of the ADEA to persons forty and older). We conclude that this evidence does not reliably indicate a pattern of age discrimination. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) ("[A] plaintiff's mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." (quotation omitted)); *Martinez v. Wyo., Dep't of Family Servs.*, 218 F.3d 1133, 1137 (10th Cir. 2000) ("Speculation, of course, does not suffice for evidence."); *see also Vanasco v. National-Louis Univ.*, 137 F.3d 962, 967 (7th Cir. 1998) (stating that "evidence of scattered decisions either favoring or disfavoring older employees reveals little about the [employer's] processes and is certainly insufficient, without more, to prove a pattern of age discrimination").

We conclude that no reasonable jury could find pretext from the evidence offered by Enderwood.

## III. Oklahoma Anti-Discrimination Law

Enderwood argues that the district court erred in dismissing his OADA and *Burk* claims. But the district court did not dismiss his *Burk* claim; rather, in response to the defendants' first motion to dismiss, Enderwood conceded—perhaps prematurely—that his *Burk* claim "ha[d] no basis under Oklahoma law," Aplt. App., Vol. 1 at 66, and he abandoned the claim by filing an amended complaint that completely omitted it, *see Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991) (observing that "an amended complaint ordinarily supersedes the original and renders it of no legal effect" (quotation omitted)).[1] And while the district court did dismiss Enderwood's OADA claim in response to the defendants' second motion to dismiss, it correctly ruled that the OADA does not provide anything more than an administrative remedy for age discrimination. *See Saint*, 145 P.3d at 1038-39; *Tate v. Browning-Ferris, Inc.*, 833 P.2d 1218, 1229 (Okla. 1992).

---

[1]     One month after the district court entered summary judgment, resolving the remainder of Enderwood's claims, the Oklahoma Supreme Court extended the *Burk* tort to "those who allege employment age discrimination." *See Saint*, 145 P.3d at 1039, *abrogating List*, 910 P.2d at 1014. While we "must review the District Court's judgment in light of presently existing [state] law, not the law in effect at the time that judgment was rendered," *Fusari v. Steinberg*, 419 U.S. 379, 387 (1975), we reiterate that Enderwood's *Burk* claim was removed from this case by Enderwood. Consequently, there is no district court ruling regarding *Burk* for us to review.

## IV. Vacation Pay

Enderwood relies on *Biggs v. Surrey Broadcasting Co.*, 811 P.2d 111 (Okla. Civ. App. 1991), for his claim for vacation pay. "While not binding on this court, decisions by a state's intermediate appellate courts provide evidence of how the state's highest court would rule on the issue, and we can consider them as such." *Combs v. PriceWaterhouse Coopers LLP*, 382 F.3d 1196, 1200 n.1 (10th Cir. 2004) (quotation omitted). We generally follow intermediate rulings in the absence of "other persuasive data that the highest court of the state would decide otherwise." *Id.* (quotation omitted).

To begin, Enderwood belatedly seeks to certify the question to the Oklahoma Supreme Court. We deny Enderwood's motion to certify this issue to the Oklahoma Supreme Court, as "[w]e generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court." *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.*, 442 F.3d 1239, 1242 n.1 (10th Cir. 2006) (quotation omitted). Moreover, "[w]hether to certify a question of state law to the state supreme court is within the discretion of the federal court," *Oliveros v. Mitchell*, 449 F.3d 1091, 1093 (10th Cir. 2006) (quotation omitted), and we decline to exercise our discretion here, given the clarity of the regulations and the terms of Sinclair's employment policy, which Enderwood agreed to.

Turning to the merits of the claim, in *Biggs*, the Oklahoma Court of Civil Appeals held that a fired employee was entitled to payment for unused vacation time, even though the employer's leave policy limited payment "to situations where the employee gives two weeks' notice." 811 P.2d at 114. The court reasoned that not only was the fired employee unable to comply with the employer's policy, but that the Oklahoma statute requiring payment of an employee's wages upon the end of employment, Okla. Stat. Ann. tit. 40, § 165.3, lacked an "involuntary termination exception." *Biggs*, 811 P.2d at 114. We conclude that *Biggs* is not dispositive of Enderwood's claim.

In the aftermath of *Biggs*, § 165.3 has been clarified by regulation. When Enderwood was fired in 2003, § 165.3 read, "Whenever an employee's employment terminates, the employer shall pay the employee's wages in full, less offsets . . . ." Okla. Stat. Ann. tit. 40, § 165.3(A) (West 1999).[2] "Wages" include vacation pay "which [is] earned and due, or provided by the employer to his employees in an established policy." *Id.* § 165.1(4). The Oklahoma Commissioner of Labor, who is charged with "enforc[ing] and "administer[ing] the provisions of [Title 40]," *id.* § 165.7(A), has clarified the definition of "wages" in three critical respects. First, wages are not "earned and due" if a

---

2      The legislative amendments to sections 165.3 and 165.1, effective November 1, 2005, are not retroactive, and therefore, are inapplicable to this case. Okla. Stat. tit. 40, §§ 165.1 & 165.3(A) (West Supp. 2007); *see also* 2005 Okla. Laws, ch. 359, § 2.

"condition[ ] precedent to payment" has not been met. Okla. Admin. Code § 380:30-1-2. Second, an "established policy" includes a written employment policy. *Id.* And third, any conditions regarding vacation benefits "contained in a written policy signed by the employee" must be satisfied before "the benefit becomes part of wages earned and due." *Id.* § 380:30-1-8(e); *see also id.* § 380:30-1-5(4) (stating that the "Department shall reject any [accrued-leave] claim if the . . . claimant has failed to meet all conditions precedent required for such payment"). Thus, an employer's written policy, signed by the employee, which conditions payment for unused vacation time on the employee not being terminated for cause, will defeat an accrued-leave claim brought by an employee terminated for cause. Because Sinclair's employment policy, which Enderwood agreed to, precludes "payment for unused vacation . . . to an employee who . . . is dismissed for cause," Aplt. App., Vol. 3 at 846, and because Enderwood has not identified sufficient evidence to dispute his termination for cause, his claim for vacation pay fails.

## V. Tortious Interference

To plead a claim for tortious interference with contract or business relations, the plaintiff must allege that (1) he had a contractual or business right that was interfered with; (2) the interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage. *Mac Adjustment, Inc. v. Prop.*

-17-

*Loss Research Bureau*, 595 P.2d 427, 428 (Okla. 1979). Further, a wrongful-interference claim "can arise only when one who is not a party to a contract interferes with that contract by convincing one of the contracting parties to breach its terms." *Voiles v. Santa Fe Minerals, Inc.*, 911 P.2d 1205, 1210 (Okla. 1996). Thus, an agent of a principal cannot be held liable for interfering with a contract between the principal and another party. *Martin v. Johnson*, 975 P.2d 889, 896 (Okla. 1998). But if the agent acts outside the scope of the agency, he can be held liable. *Id.* at 896-97 & 897 n.8. We conclude that Enderwood's allegations are fatal to his interference claim.

In the amended complaint, he alleged that human resources vice-president Thompson, acting on Butler's advice and Sinclair's behalf, "wrongfully induced [KOKH] to breach its employment agreement with [him]." Aplt. App., Vol. 1 at 97. But he also alleged that Sinclair owned KOKH, *id.* at 95, that Butler and Thompson were Sinclair employees "acting in the scope of their employment," *id.* at 100, and that he reported to Butler, *id.* at 96. Based on these allegations, no third party interfered with the KOKH/Enderwood contract: Sinclair and KOKH were basically indistinguishable for purposes of Enderwood's employment, and Butler and Thompson properly acted as Sinclair's agents. Enderwood cannot state a viable interference claim by essentially alleging that Sinclair interfered with its own contract.

The judgment of the district court is AFFIRMED.

Entered for the Court


Robert H. Henry
Circuit Judge